IN THE SUPREME COURT OF TEXAS
 
════════════
No. 09-0558
════════════
 
Marsh USA Inc. and Marsh & 
McLennan Companies, Inc.,
Petitioners,
 
v.
 
Rex Cook, 
Respondent
 
════════════════════════════════════════════════════
On Petition for Review from 
the
Court of Appeals for the Fifth District of 
Texas
════════════════════════════════════════════════════
 
 
Argued September 
16, 2010
 
 
            
Justice Willett, concurring 
in the judgment only.
            
I agree the trial court should take first crack at assessing whether 
today’s noncompetition covenant “contains limitations as to time, geographical 
area, and scope of activity . . . that are reasonable and do 
not impose a greater restraint than is necessary.”[1] That inquiry—essentially, “Are the 
restrictions too restrictive?”—received scant attention below, rendering 
the record before us underdeveloped. The affidavit submitted by Marsh USA 
(Marsh) asserts that the stock-incentive plan aimed to boost goodwill by giving 
Cook a stake in Marsh’s long-term success.[2] Growing goodwill is all well and good, 
but the affidavit then says this: The noncompete 
“prevents employees from using that goodwill . . . to attract the customer to 
a competitor.” On the surface, this seems just another way of saying the noncompete’s purpose is to stifle competition, but perhaps a 
fuller record on remand will paint a less protectionist picture.
            
So I agree to remand, but I write separately to underscore this 
admittedly obvious point: Restrictions on employee mobility that exist only to 
squelch competition are per se illegal in Texas, and for good reason. Economic 
dynamism in the 21st century requires speed, knowledge, and 
innovation—imperatives that must inform judicial review of efforts to sideline 
skilled talent.[3] Courts must critically examine noncompetes in light of our contemporary, knowledge-based 
economy that prizes ingenuity and intellectual talent. This much is clear: 
Courts cannot countenance covenants too contemptuous of competition.
* 
* *
            
Amid increasing labor fluidity, there is no shortage of debate 
surrounding the propriety of enforcing restrictive covenants that tie up skills, 
knowledge, ideas, and expertise. The fault line runs between first 
principles—freedom of contract versus freedom of competition—and judicial 
treatment of noncompetes has been, well, eclectic.[4] Some jurisdictions favor freedom of 
contract (enforcing a noncompete because the employee 
signed it) and fret little about whether the company’s interest is legitimate;[5] other jurisdictions (most notably, 
California) champion freedom of competition and void virtually all 
noncompetes;[6] Texas courts, like most, enforce 
“reasonable” ones necessary to protect legitimate interests.[7] This multiplicity of standards across 
states—dubbed “fifty ways to leave your employer”[8]—makes for an unsteady legal landscape, 
particularly for far-flung employers that operate throughout the country.
            
Today’s case, like many before it, involves a familiar tension between 
company and employee, both intent on self-protection. 
The interest Marsh aims to protect, though, is less familiar. Marsh does not 
argue that the noncompete was needed here to protect 
costly investments in specialized training or to ensure its trade secrets or 
other confidential information[9] do not wind up on WikiLeaks.[10] Marsh speaks of safeguarding its 
goodwill, and that is a protectable interest. But uttering the word goodwill is 
not enough; magic words do not boast auto-enforceability. Marsh must demonstrate 
that it is not invoking goodwill to camouflage a less noble interest: escaping 
future competition from Cook.[11]
            
As the trial court begins its examination, I add these two points:
            
First, while goodwill is a protectable interest, 
protectionism—going too far to protect what may be protectable—is verboten. 
Texas courts must probe noncompete covenants in that 
pro-free-market spirit. The Free Enterprise and Antitrust Act declares the 
public policy of Texas: “Every contract, combination, or conspiracy in restraint 
of trade or commerce is unlawful.”[12] The Act’s paramount purpose “is to 
maintain and promote economic competition in trade and commerce . . . and to provide the 
benefits of that competition to consumers in the state.”[13]
            
One obvious exception is the Covenants Not to Compete Act,[1][4] which permits a noncompete clause, but only “to the extent it contains 
limitations as to time, geographical area, and scope of activity to be 
restrained that are reasonable and do not impose a greater restraint than 
is necessary to protect the goodwill or other business interest of the 
promisee.”[15] This exception 
is just that—an exception—with the rule favoring robust competition.
            
As for who decides whether limitations (1) are reasonable, (2) are more 
severe than necessary, and (3) relate to a legitimate business interest, the 
Covenants Not to Compete Act expressly vests that duty with courts.[16] Judges must divine when competition 
becomes unfair competition and when a restraint becomes an 
unreasonable or unnecessarily restrictive restraint. To be sure, 
the standard has a certain eye-of-the-beholder flavor—a vagueness that 
inexorably produces the case-by-case unpredictability that haunts this area of 
employment law.[17]
            
Alongside “reasonableness,” the statute also requires that the agreement 
“not impose a greater restraint than is necessary.”[18] We have never 
squarely addressed whether the Act envisions two separate inquiries: (1) that 
the time/geography/scope limitations be “reasonable,” and also (2) that the 
restraint not reach beyond that which is “necessary” to protect the company’s 
protectable interests. The latter suggests more exacting scrutiny than mere 
“reasonableness.” The Act separates the latter from the former with the 
conjunction “and,” suggesting separateness, while the pre-1993 version of the 
Act fused the two explicitly.[19] None of our 
cases declare whether “reasonable” and “necessary” are two separate inquiries or 
whether the latter is simply blended into the former. Many courts implicitly 
subsume everything under an overarching banner of reasonableness,[2][0] while others treat them as separate 
prongs.[21] Either way, it is not an issue we reach 
today.
            
So while Texas law allows limited noncompetes, 
it does not allow protectionism to trump individual or societal interests in a 
dynamic marketplace. And even assuming a company is trying to guard a bona fide 
business interest, Texas courts must strike down restrictions that are 
unreasonable or more severe than necessary.
            
The underpinnings of this principle long predate Texas (or America) and 
draw from the recognition that bustling markets best spur and reward 
ingenuity.[22] The Lone Star State lauds economic 
dynamism. And while it is perhaps natural for a profit-maximizing company to 
bend toward collusive or monopolistic restriction,[2][3] Texas law is hostile to such 
noncompetitive impulses. Nor can it be doubted that some companies try to tilt 
the playing field via dubious noncompete covenants, 
even facially unenforceable ones, knowing that even the specter of 
enforcement action will chill employees (and their potential employers) into 
preemptive capitulation.[24]
            
Given this firm foundation, courts’ broad discretion in scrutinizing 
noncompetes, and the Legislature’s clearly stated 
opposition to contracts that unduly restrain competition, I would underscore 
that a noncompete rooted in protectionism alone is per 
se invalid under the Covenants Not to Compete Act and surely offends the Act’s 
purpose of giving Texans the benefits of competition that is fierce yet also 
fair. Restraint of trade for its own sake is not a protectable “business 
interest” under Section 15.50, any more than violations of employee wage, hour, 
or safety laws are legitimate business interests that can be protected through a 
restrictive covenant.
            
More to the point, while “goodwill” is a bona fide business interest 
under the Act, it is not enough merely to mutter the word. You cannot simply buy 
a covenant not to compete. A court cannot uphold a noncompete on goodwill grounds absent a record that 
demonstrates the limitations are reasonable and as nonburdensome as possible. Every company has customer 
relationships and attendant goodwill it wants to cultivate by incentivizing 
employees to stay, but merely asserting goodwill is not enough. Marsh 
contends “Cook could take the customer relationships grown as a result of the 
stock incentive and use them to compete with Marsh,”[25] but that unadorned assertion is 
insufficient. And even assuming the incentive spurred Cook to grow Marsh’s 
goodwill (which strikes me as a curious and slippery proposition), does that 
prove too much, lest any workplace benefit—a bonus, a raise, a promotion, a 
better parking space—suffice to justify a noncompete 
because it theoretically motivates an employee to strengthen client 
relationships? The evidentiary record must demonstrate special circumstances 
beyond the bruises of ordinary competition such that, absent the covenant, Cook 
would possess a grossly unfair competitive advantage. And even then the 
restrictions imposed must be as light as possible and not restrict Cook’s 
mobility to an extent greater than Marsh’s legitimate need.
            
Second, naked restraints of trade are particularly onerous 
because, besides stifling beneficial competition, they also meddle with people’s 
right to earn an honest living. Sixty-five years ago, we declared the right to 
use one’s “own labor in any lawful employment . . . one of the first and 
highest of civil rights.”[26] The right to 
pursue a chosen occupation and career path is indeed highly cherished, but it is 
also highly vulnerable. For many people, their livelihood is inextricably tied 
to a certain pursuit of happiness, and losing this liberty should never be 
lightly regarded. Fittingly, courts have recognized a right to work of 
constitutional dimension, at least in cases where state action was alleged. 
Nearly a century ago, the United States Supreme Court explained that “the right 
to work for a living in the common occupations of the community is of the very 
essence of the personal freedom and opportunity that it was the purpose of the 
[Fourteenth] Amendment to secure.”[27] The Court made a similar point around 
that time in a case arising from Texas:
 
In so far 
as a man is deprived of the right to labor, his liberty is restricted, his 
capacity to earn wages and acquire property is lessened, and he is denied the 
protection which the law affords those who are permitted to work. Liberty means 
more than freedom from servitude, and the constitutional guaranty is an 
assurance that the citizen shall be protected in the right to use his powers of 
mind and body in any lawful calling.[28]
 
 
            
Such eloquence has spanned centuries. Saint Thomas Aquinas addressed the 
connection between work and existence itself: “[I]t is natural to a man to love 
his own work (thus it is to be observed that poets love their own poems); and 
the reason is that we love to be and to live, and these are made manifest 
especially in our action.”[29] Ralph Waldo Emerson, typically 
transcendentalist, called it “the high prize of life, the crowning fortune of a 
man . . . to be born with a bias to 
some pursuit, which finds him in employment and happiness,—whether it be to make 
baskets, or broadswords, or canals, or statues, or songs.”[30] Voltaire took the utilitarian, albeit 
narrow, view: “[O]ur labour 
keeps off from us three great evils,” he said, “idleness, vice, and 
want.”[31] We would be 
unwise not to linger where a priest, a poet, and a polemicist all miraculously 
agree. Where the judiciary is empowered to pass upon a subject that so 
viscerally affects the citizenry, it should do so with utmost care. Sometimes 
that care will demand a painstaking weighing of interests. In other moments, it 
will demand that certain constraints—those that restrict the right to work for 
no better reason than to erase the competition a company sought by entering the 
marketplace—be declared categorically void. In all cases, it requires 
chary judges who respect our law’s rootedness in 
economic liberty and vitality.
            
This is doubly true in times of economic hardship. President Franklin 
Roosevelt’s first inaugural address is largely remembered for the iconic phrase, 
“the only thing we have to fear is fear itself”[32]—a potent sound bite that is often 
removed from the crucial context that surrounded it. The fear President 
Roosevelt spoke about in 1933 sprang largely from the financial crater left by 
the Great Crash of 1929 and the agonizing Great Depression that followed. The 
Depression’s devastating effects prompted the new president to couple his 
discussion of fear with an emphasis on the salve to that fear: the importance of 
“[t]he joy and moral stimulation of work.”[33] It was the process—the act of committing 
oneself—that mattered. “Happiness lies not in the mere possession of money,” he 
explained, “it lies in the joy of achievement, in the thrill of creative 
effort.”[34] The virtue of 
work is no less fundamental today. Companies must tread lightly when undertaking 
to curb that liberty. And if employers pass uncalled-for limits, we call on 
judges to pass upon them.
            
The “true beginning of the modern law”[35] on post-employment restraints is Mitchel v. Reynolds,[36] a 1711 English-court decision that stood 
as the most cited case on the subject for two-and-a-half centuries.[37] While introducing the so-called “rule of 
reason” for evaluating such agreements—whether a legitimate economic or business 
purpose justified the restriction[38]—Mitchel expressed concern that 
such agreements were subject to “great abuses . . . from 
masters, who are apt to give their apprentices much vexation on this account, 
and to use many indirect practices to procure such bonds from them, lest they 
should prejudice them in their custom, when they come up to set up for themselves.”[39] Though the 
contours of noncompete doctrine have changed as the 
American economy has changed, this astute observation merits remembering. The 
“vexation” feared in 1711 is no less real 300 years later. In 2011, overbroad 
restrictions can strain the gears of an economic engine that has propelled this 
country so well, and so far. In 2011, terms too severe to be enforced can also 
escape challenge altogether, instead acting in terrorem to freeze an untold number of employees in 
place rather than allowing human capital to find its highest and best use and 
thus augment economic and technological growth.[40] This seems especially notable in today’s 
era of dizzying technological change, when implicit lifetime tenure is obsolete 
and frequent job-hopping is ordinary (unless someone has been forced to sign 
away his or her right to compete).[41]
            
Restrictive covenants are not costless, and even a mutually acceptable 
noncompete can impose a deadweight loss on broader 
society. Courts should not confuse a noncompete’s 
impact on the employee with its impact on competition. A restraint may be 
perfectly agreeable to both parties today but still harm consumers tomorrow. 
Moreover, as our economy becomes even more technologically advanced and 
knowledge-based (key contributors to a so-called high-velocity labor market), 
overreaching restrictions lock up human capital and decelerate the beneficial 
knowledge spillover that accrues from greater mobility. It remains the job of 
courts to be vigilant for practices that tend to servility, that deprive the 
public of desired services, and that quash rivals via forced restriction rather 
than forceful competition.[42]
* 
* *
            
I recognize that a free market is not innately utopian, with frictionless 
edges that never need sanding. “If men were angels, no government would be 
necessary,”[43] much less antitrust laws to curb 
monopolistic impulses. Under Texas law, we must dutifully enforce noncompetes that impose reasonable limitations that are no 
more restrictive than necessary in order to advance legitimate business 
interests. But this duty requires circumspection, lest the “Covenants Not to 
Compete Act” exception swallow the “Free Enterprise and Antitrust Act” rule. The 
latter sides with the virtues of economic liberty—the basic right to pursue what 
you choose, where you choose, and among whom you choose—not the vice of unduly 
denying skilled people the rewards of their earned success or injuring society 
by depriving the wider public of someone’s talents and enterprise. So while free 
enterprise recognizes—demands, actually—that economic actors will 
doggedly pursue self-interest, Texas noncompete law 
recognizes the difference between constructive self-interest and destructive 
selfishness. Where a naked restraint of trade masquerades as a covenant not to 
compete, we must strike it down—always.
            
Summing up: Post-employment restrictions are restraints on trade and, as 
such, deserve rigorous legal scrutiny, particularly given today’s pace of 
warp-speed economic change. Noncompetes tailored to 
protectable business interests have their lawful place, but they should be used 
sparingly and drafted narrowly. And employers must demonstrate special facts 
that legitimize the noncompete agreement. Squelching 
competition for its own sake is an interest unworthy of protection. Competition 
by a former employee may well rile an employer, but companies do not have free 
rein to, by contract, indenture an employee or dampen everyday competition that 
benefits Texas and Texans.
 
______________________________
                                                                                                                        
Don R. Willett
                                                                                                                        
Justice
 
OPINION DELIVERED: June 24, 2011







[1] Tex. Bus. & 
Com. Code § 
15.50(a).

[2] 
Though styled a “Non-Solicitation Agreement,” the 
agreement also operates as a kitchen-sink noncompetition agreement. Besides 
stating Cook may not “solicit” business from Marsh’s clients or prospects, it 
also says Cook may not “accept,” “perform,” or “supervise” business involving 
them.

[3] 
The efficacy of restrictions on employee mobility 
is a matter of spirited debate among economists, lawyers, and legal scholars. A 
growing body of nascent scholarship contends that overbroad noncompete agreements actually harm innovation rather than 
foster it when they irrationally impede job-hopping. See, e.g., Norman D. 
Bishara, Covenants Not to Compete in a Knowledge 
Economy: Balancing Innovation From Employee Mobility Against Legal Protection 
for Human Capital Investment, 27 
Berkeley J. Emp. & Lab. L. 287, 306–07 (2006) [hereinafter “Bishara, Covenants Not to Compete in a Knowledge 
Economy”]; Ronald J. Gilson, The Legal Infrastructure of High Technology 
Industrial Districts: Silicon Valley, Route 128, and Covenants Not to 
Compete, 74 N.Y.U. L. Rev. 
575, 594–619 (1999); Charles Tait Graves and James A. 
DiBoise, Do Strict Trade Secret and Non-Competition 
Laws Obstruct Innovation?, 1 
Entrepreneurial Bus. L. J. 323, 323 (2006) [hereinafter “Graves and DiBoise, Strict Trade Secret and Non-Competition 
Laws”]; Alan Hyde, Should Noncompetes Be 
Enforced?, 
Regulation (Cato Inst.), Winter 
2010–11, at 6; Alan Hyde, The Wealth of Shared Information: Silicon Valley’s 
High-Velocity Labor Market, Endogenous Economic \fs20softlineGrowth, 
and the Law of Trade Secrets (Sept. 1998), 
http://andromeda.rutgers.edu/~hyde/WEALTH.htm.http://andromeda.rutgers.edu/~hyde/wealth;

[4] 
As noted in 1960—and this persists a half-century 
later—court precedent “has reflected the evolution of industrial technology and 
business methods, as well as the ebb and flow of such social values as freedom of contract, personal 
economic freedom, and business ethics. But the fundamental interests which come 
into conflict have not basically changed.” Harlan M. Blake, Employee 
Agreements Not To Compete, 73 Harv. 
L. Rev. 625, 626–27 (1960) 
[hereinafter “Blake, Employee 
Agreements”].

[5] 
See 
Brandon S. Long, Protecting Employer Investment in Training: Noncompetes vs. Repayment Agreements, 54 Duke L.J. 1295, 1302–03 (2005) (“For 
instance, some courts have found that freedom of contract principles support 
enforcing all contracts made between competent parties, so long as those 
contracts are neither illegal nor unconscionable.”) (footnote omitted).

[6] Cal. Bus. & Prof. Code § 16600; Viva R. Moffat, The Wrong Tool for the Job: 
The IP Problem With Noncompetition Agreements, 52 Wm. & Mary L. Rev. 873, 877 n.5 
(2010) [hereinafter “Moffat, The Wrong Tool”].

[7] 
Moffat, The 
Wrong Tool, at 880.

[8] 
Bishara, Covenants Not to Compete in a Knowledge 
Economy, at 317.

[9] 
The mere fact that the noncompete prohibited Cook from disclosing trade secrets or 
confidential or proprietary information is immaterial given the absence of 
anything in the record showing that Cook ever received such information. 
See Plaintiffs’ Resp. to Defendant’s Mot. Summ. J. at 18 (“Cook’s 
reliance on Sheshunoff is particularly 
misplaced. Sheshunoff involved 
confidential information, not stock.”) (citation omitted); Pet. Br. at 11 n.10 
(“[C]onfidential information was not at issue.”); 
Transcript of Oral Argument at 2, Marsh USA Inc. v. Cook, __ S.W.3d __ 
(2011) (No. 09-0558) (“This is a not a confidential information 
case . . . .”). As we explained in Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson, the employer must at 
some point provide consideration for the agreement, such as confidential 
information, in order for the agreement to be enforceable. 209 S.W.3d 644, 650–51 (Tex. 
2006).

[10] As Light v. 
Centel Cellular Co. of Tex. demonstrates, 
however, even these alleged interests would not automatically render the 
covenant valid. See 883 S.W.2d 642, 646–48 (Tex. 1994) (holding 
invalid a covenant not to compete that pertained to specialized training, even 
though confidential or proprietary information was involved).

[11] There is no 
significance to the fact that Cook was paid in stock options for the covenant 
not to compete. Where the goal is restricting competition, the manner of payment 
is irrelevant. If stock options permit such a covenant because, as the affidavit 
states, they align the interests of the employee with “the long-term success of 
the company, which, in turn enhances the goodwill of” the employer, then any 
reward for a job well done—a raise, promotion, bonus, or pension—could 
justify a noncompete on grounds it aligns 
employer/employee interests and thus bolsters “goodwill.” At bottom, none of 
these rewards, like “merely promising to pay a sum of money to the employee,” 
can be used to purchase a noncompete whose only 
purpose is to eliminate competition. Sheshunoff, 209 S.W.3d at 
650. Absent some other legitimate reason, such a restraint on trade is 
unenforceable.

[12] Tex. Bus. & 
Com. Code § 
15.05(a).
 

[13] Id. § 
15.04.

[14] See 
id. § 15.50(a) (“Notwithstanding 
Section 15.05 of this code . . . a 
covenant not to compete is enforceable . . . .” 
).

[15] Id. 
(emphasis added).

[16] Id. §§ 
15.50–.51.

[17] In a sense, 
the “reasonableness” inquiry resembles the oversight long exercised by courts 
when applying the rule of reason under antitrust laws. While “reasonableness” 
analysis in noncompete cases and “rule of reason” 
analysis in antitrust cases are not identical, both inquiries envision a 
front-and-center judicial role in scrutinizing agreements that curb 
competition.
 
                
 Rule of reason analysis 
under antitrust laws must not be confused with reasonableness analysis under the 
common law. Rule of reason analysis tests the effect of a restraint of trade on 
competition. By contrast, whether a noncompetition agreement is 
reasonable depends upon its effect on the parties, the competitors, as it 
were. The two standards are not directly related.
 
DeSantis v. Wackenhut Corp., 793 S.W.2d 670, 688 (Tex. 1990). While this portion of our analysis draws upon the 
instant contract’s effect on competition, that analysis stems from an initial 
consideration of the contract’s effect on the parties, who are—at bottom—actors 
in a broader competitive scheme. This slight distinction demonstrates that while 
the two standards may not be directly related, in practice they are indirectly 
related.

[18] Tex. Bus. & 
Com. Code § 
15.05(a).

[19] Under the 
pre-1993 version, a noncompete was enforceable to the 
extent it “contains reasonable limitations as to time, geographical area, and 
scope of activity to be restrained that do not impose a greater restraint 
than is necessary to protect the goodwill or other business interest of the 
promisee.” Act of May 23, 1989, 71st 
Leg., R.S., ch. 1193, § 1, 1989 
Tex. Gen. Laws 4852 (amended 1993) (current 
version at Tex. Bus. & Com. 
Code § 15.50(a)) (emphasis added). The current version reads, 
“contains limitations as to time, geographical area, and scope of activity to be 
restrained that are reasonable and do not impose a greater restraint than 
is necessary to protect the goodwill or other business interest of the promisee.” Tex. Bus. 
& Com. Code § 15.50(a); Act of May 29, 1993, 73d Leg., ch. 
965, § 9_64791, 
1993 Tex. Gen. Laws 4201 
(emphasis added).

[20] See, e.g., 
Zep Mfg. Co. v. Harthcock, 824 S.W.2d 654, 660 (Tex. App.—Dallas 1992, 
no writ).

[21] See, e.g., 
Am. Express Fin. Advisors, Inc. v. Scott, 955 F. Supp. 688, 691 (N.D. 
Tex. 1996).

[22] Adam’s Smith 
ode to laissez-faire economics, The Wealth of Nations, remains worthy of 
study today:
 
It is the interest of [the] sovereign . . . to open the most 
extensive market for the produce of his country, to allow the most perfect 
freedom of commerce, in order to increase as much as possible the number and the 
competition of buyers; and upon this account to abolish, not only all 
monopolies, but all restraints upon the transportation of the home produce from 
one part of the country to another . . . . He is in 
this manner most likely to increase both the quantity and value of that produce, 
and consequently of his own share of it, or of his own revenue.
 
Adam Smith, The Wealth of 
Nations: Book II 411–12 (P.F. Collier & 
Son 1902) (1776). Similarly, the domino effect that would result from permitting 
such restraints to remain cannot be understated. See id. at 371 (“[A 
monopoly] not only hinders, at all times, . . . capital from 
maintaining so great a quantity of productive labor as it would otherwise 
maintain, but it hinders it from increasing so fast as it would otherwise 
increase, and consequently from maintaining a still greater quantity of 
productive labor.”).

[23] See id. 
at 412 (“Their mercantile habits draw [merchants] in this 
manner, almost necessarily, though perhaps insensibly, to prefer upon all 
ordinary occasions the little and transitory profit of the monopolist to the 
great and permanent revenue of the 
sovereign . . . .”).

[24] See infra 
note 40 and related text. Some 
legal commentators are unsubtle in their market-based objections to 
non-solicitation agreements specifically:
 
                
 As to the non-solicitation 
of customers, such covenants are monopolistic and overreaching. What if the 
customer would prefer to do business with the former employee, or at least seek 
a competing price quote, but does not know that the former employee has resigned 
and started a new business? Something is amiss when consenting businesses cannot 
transact business together, merely because another business got there first. As 
with non-competition covenants generally, such contracts appear to restrict 
competitive activities that might lower prices, provide better services for 
customers, and allow businesses to partner together where that might be most 
productive.
 
Graves and DiBoise, Strict Trade Secret and Non-Competition 
Laws, at 334.

[25] Pet. Br. at 31.

[26] Int’l 
Printing Pressmen & Assistants’ Union of N. Am. v. Smith, 198 S.W.2d 729, 740 (Tex. 1946) (Brewster, J., 
dissenting).

[27] Truax 
v. Raich, 239 
U.S. 33, 41 (1915) (citations omitted). See also Bd. of Regents of State 
Colleges v. Roth, 408 U.S. 564, 572 (1972) (recognizing the right “to engage 
in any of the common occupations of life” as a constitutional liberty interest); 
Stidham v. Tex. Comm’n on Private Sec., 418 F.3d 486, 491 (5th Cir. 
2005) (“We have confirmed the principle that one has a constitutionally 
protected liberty interest in pursuing a chosen occupation.”) (citations omitted).

[28] Smith v. Texas, 
233 U.S. 630, 636 (1914).

[29] 2 St. Thomas Aquinas, Summa 
Theologica pt. II, q. 26, 
art. 12, at 519 (Fathers of the 
English Dominican Province trans., Daniel J. Sullivan rev., Encyclopedia 
Britannica, Inc. 1952) (1265–74).

[30] Ralph Waldo Emerson, Conduct 
of Life 234 (1860).

[31] Voltaire, Candide 
119 (Samuel Johnson ed., George Rutledge 
and Sons 1884) (1694).

[32] President Franklin D. Roosevelt, First Inaugural Address 
(Mar. 4, 1933).

[33] Id.

[34] Id.

[35] 8 Sir William S. 
Holdsworth, A History of English Law 60 (2d ed. 
1973).

[36] (1711) 24 Eng. Rep. 347 (Q.B.); 1 P. Wms. 181.

[37] Blake, Employee Agreements, at 
629.

[38] See 
Moffat, The Wrong Tool, at 
880.

[39] Mitchel, 24 Eng. Rep. at 350; 1 P. Wms. at 190.

[40] See 
Cynthia L. Estlund, Between Rights and Contract: Arbitration 
Agreements and Non-Compete Covenants as a Hybrid Form of Employment Law, 155 
U. Pa. L. Rev. 379, 406 (2006) 
(“An overbroad non-compete—one that lasts too long or that covers activities 
that do not threaten the employer’s legitimate interests—may deter the employee 
from quitting and competing even when she has a right to do so, or it may deter 
a competitor from hiring the employee.”). The in terrorem effect is magnified in jurisdictions like 
Texas, where judges simply “blue pencil” overbroad noncompetes to make them enforceable. See Tex. Bus. & Com. Code 
§ 15.51(c); e.g., Prod. Action Int’l, Inc. v. Mero, 277 F. Supp. 2d 919, 931 (S.D. Ind. 2003) (“A 
current employee may be frozen in his or her job by an unreasonably broad 
covenant. Even if the employee believes the covenant is too broad, she may be 
able to test that proposition only through expensive and risky litigation.”); 
Richard P. Rita Pers. Servs. Int’l., Inc. v. Kot, 191 S.E.2d 79, 81 (Ga. 1972) (“If severance is 
generally applied, employers can fashion truly ominous covenants with confidence 
that they will be pared down and enforced when the facts of a particular case 
are not unreasonable.”).

[41] Noncompetes 
also shelter struggling companies that are facing headwinds of recession or 
industry turmoil. An at-will employee might see dire times ahead for the company 
but is unable to find new employment if the prospect of litigation spooks the 
employee or a potential new employer. “As a result, the individual may lose 
opportunities to advance her career and compensation, and the employer may be 
able to insulate itself at least temporarily from the competition of more 
vibrant enterprises for productive employees.” Kate O’Neill, “Should I Stay 
or Should I Go?”–Covenants Not to Compete in a Down Economy: A Proposal for 
Better Advocacy and Better Judicial Opinions, 6 Hastings Bus. L. J. 
83, 118 (Winter 2010).

[42] Burdens on 
inter-firm mobility are especially acute in a fast-paced and tumultuous 
21st-century economy. Greater mobility would, one suspects, spur, not curb, the pace of high-tech advances and the 
dissemination of ideas and knowledge.

[43] The Federalist No. 
51 (James 
Madison).